# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00421-COA

**MICHAEL C. MOLLESTON, M.D.**                                        **APPELLANT**

**v.**

**RIVER OAKS HOSPITAL, INC., RIVER OAKS**                         **APPELLEE**
**HEALTH SYSTEM D/B/A RIVER OAKS EAST**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/11/2014 |
| TRIAL JUDGE: | HON. WILLIAM R. BARNETT |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | WHITMAN B. JOHNSON III |
| | GAINES SPENCER BEARD JR. |
| ATTORNEYS FOR APPELLEE: | THOMAS L. KIRKLAND JR. |
| | ANDY LOWRY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | AFFIRMED APPELLEE'S DECISION TO DENY APPELLANT'S APPLICATION FOR MEDICAL-STAFF PRIVILEGES |
| DISPOSITION: | REVERSED AND REMANDED - 11/10/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON  AND MAXWELL, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.    Dr. Michael Molleston appeals River Oaks Hospital's decision to deny his application for medical-staff privileges.  We find that River Oaks violated Dr. Molleston's due-process rights and its own bylaws when it allowed a physician to actively participate in two stages of the administrative process.  We therefore reverse the Rankin County Chancery Court's judgment and remand this case for further proceedings consistent with this opinion.

**FACTS**

¶2.    Dr. Molleston, a neurosurgeon, has practiced in Mississippi since 1995. He maintained a private practice in Hattiesburg, Mississippi, and he was the neurosurgeon for the University of Southern Mississippi football team.   In 2011, Dr. Molleston decided to move to Jackson.  He successfully applied for medical-staff privileges at Central Mississippi Medical Center.

¶3.    Dr. Molleston also applied for medical-staff privileges at River Oaks on September 12, 2011.   On November 7, 2011, the Credentials Committee of River Oaks met and reviewed Dr. Molleston's application.  The record reflects that the Credentials Committee was composed of the following:  Dr. Bush, Committee Chair; Dr. Davis; Dr. Keven Vance; Dr. William McCraney; Cindy Dishongh, Chief Operating Officer of Business Development; Shannon Brown, Chief Operating Officer; Sherry Cook, Chief Nursing Officer; Rebecca Wilson, Medical Staff Manager; Tammy Chappell, Credentialing Specialist; and Dap Gunter, P1 Analyst.

¶4.    According to the minutes of that meeting, Dr. William G. Bush chaired the Credentials Committee.  Three other physicians attended the meeting, one of whom was Dr. John Davis, a neurosurgeon.  During the meeting, Dr. Davis informed the Credentials Committee that various defense attorneys and/or worker's compensation carriers had previously asked him or one of his partners to provide second opinions regarding patients whom Dr. Molleston had treated.  Dr. Davis explained that after his past experience of reviewing Dr. Molleston's patient records, he questioned Dr. Molleston's clinical decision-making in five different patient cases.  The Credentials Committee tabled Dr.

Molleston's application without reaching any decision over its concerns about the privileged nature of the medical information they had received from Dr. Davis.

¶5. The Credentials Committee met again on December 5, 2011, and decided to recommend denying Dr. Molleston's application for medical-staff privileges

> based on concern for the best interest and welfare of patients. This decision was made due to questionable competency and judgment, specifically related to a history of proposing and/or performing surgical procedures based on patient treatment recommendations notsupported after second neurological opinion, as well as applicant's interpretations of radiological films that conflict with Radiologists' determinations.

The minutes from that meeting show that Dr. Bush again chaired the Committee meeting.

¶6. The Medical Executive Committee met on December 9, 2011, and approved the Credentials Committee's decision to deny Dr. Molleston's application. The Medical Executive Committee Members present at the hearing were: Dr. Steven Patterson, Dr. Davis, Dr. Steven Choteau, Dr. David Wender, Dr. Barry McCay, Dr. Jack Moriarity, Chief Nursing Officer Sherry Cook, Vicki Stribling (Risk Manager), Jan Shannon (Director of Quality), Rebecca Wilson (Medical Staff Manager), Dr. Missy McMinn, Dr. David Westbrook, Dr. Ron Cannon, Dr. David Carroll, Dr. James O'Mara, Denny Bruns (Chief Executive Officer), Cindy Dishongh (Chief Operating Officer/Business Development), Bob Newton (Vice President of Surgical Services), and Shannon Brown (Chief Operating Officer).

¶7. Once Dr. Molleston received notice of the Medical Executive Committee's decision to adopt the Credentials Committee's recommendation that his application for medical-staff privileges be denied, he requested a hearing before the Fair Hearing Plan Committee at River

3

Oaks.[1] Dr. Molleston received notice from the President and CEO of River Oaks that the hearing would comply with River Oaks's Bylaws, specifically Article 15 of the Fair Hearing Plan, and Dr. Walter Shelton would chair the five-person committee. This letter specifically stated that the hearing would be held according to Article 15 of the Fair Hearing Plan in the Medical Staff Bylaws of River Oaks. Dr. Molleston was also informed that Dr. Bush would "present the case to support the adverse recommendation" by the Credentials Committee,[2] and Dr. Davis would testify about his disagreements with Dr. Molleston's clinical decisions in "various cases" at the Fair Hearing Plan Committee Meeting. However, despite requests for discovery by Dr. Molleston, he was not informed about the "various cases" that Dr. Davis planned to discuss.

¶8.    The Fair Hearing Plan Committee convened on May 2, 2012, to hear Dr. Molleston's appeal. At the hearing, Dr. Bush delegated to Dr. Davis the task of presenting the case on behalf of the Medical Executive Committee to support its decision to deny Dr. Molleston's application. As stated, Dr. Bush and Dr. Davis served on the Credentials Committee that recommended denying Dr. Molleston's application. Dr. Bush remained in attendance during the hearing.

¶9.    During the hearing, Dr. Molleston's counsel objected to the fact that River Oaks failed

---

[1] Article 15.1.1 of the Bylaws provides that if "any individual receives notice of a recommendation of the Medical Executive Committee that, if ratified by the decision of the Board of Trustees, will adversely affect [his] appointment to or status as a member of the Medical Staff or [his] exercise of clinical privileges[,]" then that individual is entitled to a hearing before a hearing committee of the medical staff, referred to herein as the Fair Hearing Plan Committee.

[2] *See* Article 15.5.8 of the Bylaws.

4

to disclose the patient records and scans that Dr. Davis submitted to support the Credentials Committee's recommendation. As a result, the hearing was postponed. When the Fair Hearing Plan Committee met again on November 5, 2011, Dr. Shelton again presided as chairperson of the Fair Hearing Plan Committee and Drs. Bush and Davis both attended. The Bylaws establish that a member of the Credentials Committee could provide support for its adverse recommendation to the Fair Hearing Plan Committee, and the Bylaws further establish that no staff member or board member who participated in the adverse commendation could be a member of the Fair Hearing Plan Committee. The Fair Hearing Plan Committee voted to affirm the decision by the Medical Executive Committee, thereby denying Dr. Molleston's application for medical-staff privileges to River Oaks Hospital. Significant to our decision on appeal, the minutes of the Fair Hearing Plan Committee hearing reflect that Dr. Bush participated in the committee's deliberations, vote, and decision.

¶10. Dr. Molleston appealed to River Oaks's Board of Trustees. The Board met on January 16, 2013, and took the matter under advisement. On February 11, 2013, the Board affirmed the decision by the Medical Executive Committee and Fair Hearing Plan Committee to deny Dr. Molleston's application.

¶11. Then, on April 8, 2013, Dr. Molleston filed an appeal in the chancery court. After oral argument, the chancellor entered an order affirming River Oaks's decision on March 11, 2014, finding "River Oaks Hospital afforded [Dr. Molleston] substantial compliance with its bylaws and procedural due process" and that "the decision of the Appellee's Board of Trustees was not arbitrary, capricious or unreasonable." This appeal followed.

¶12.   Now on appeal before this Court, Dr. Molleston again asserts that River Oaks violated his due process rights, as guaranteed by both its own bylaws and common law in two ways by:  (1) allowing a board member who actively participated in the decision to deny Dr. Molleston privileges to then serve as a deliberating and voting member of the Fair Hearing Plan Committee, and (2) allowing the chairman of the Fair Hearing Plan Committee to be a member of a private practice that was in direct economic competition with Dr. Molleston. Dr. Molleston also argues that River Oaks's reasons for denying his application for medical-staff privileges failed to comply with Mississippi Code Annotated section 73-25-83 (Rev. 2012).[3]

---

[3] Section 73-25-83 provides:

The board shall have authority to deny an application for licensure or other authorization to practice medicine in this state and to discipline a physician licensed or otherwise lawfully practicing within this state who, after a hearing, has been adjudged by the board as unqualified due to one or more of the following reasons:

> (a) Unprofessional conduct as defined in the physician licensure and disciplinary laws, pursuant to Section 73-25-29;
>
> (b) Professional incompetency in the practice of medicine or surgery; or
>
> (c) Having disciplinary action taken by his peers within any professional medical association or society, whether any such association or society is local, regional, state or national in scope, or being disciplined by a licensed hospital or medical staff of said hospital, or the voluntary surrender or restriction of hospital staff privileges while an investigation or disciplinary proceeding is being conducted by a licensed hospital or medical staff or medical staff committee of said hospital. Provided further, anybody taking action as set forth in this paragraph shall report such action to the board within thirty (30) days of

## STANDARD OF REVIEW

¶13.  Jurisprudence and statutory law provides great discretion to hospital boards in determining the moral commitment and competence of its staff when considering whether to accept applications for staff privileges.  *See Som v. Bd. of Trs. of Natchez Reg'l Med. Ctr.*, 98 So. 3d 500, 502-03 (¶8) (Miss. Ct. App. 2012.  Section 73-25-93(1) states that

> [a]ny hospital licensed pursuant to Sections 41-9-1 et seq. is authorized to suspend, deny, revoke or limit the hospital privileges of any physician practicing or applying to practice therein, if the governing board of such hospital, after consultation with the medical staff considers such physician to be unqualified because of any of the acts set forth in Section 73-25-83; provided, however, that the procedures for such actions shall comply with the hospital and/or medical staff bylaw requirements for due process.

¶14.  We acknowledge that "[t]he legislature has clearly limited judicial surveillance of hospital disciplinary proceedings[, including decisions to grant, revoke, or suspend medical staff privileges,] to the narrow inquiry of whether the hospital complied with the procedural due-process requirements prescribed by its own bylaws."  *Warnick v. Natchez Cmty. Hosp., Inc.*, 904 So. 2d 1019, 1022 (¶11) (Miss. 2004) (citing *Wong v. Garden Park Cmty. Hosp., Inc.*, 565 So. 2d 550, 551 (Miss. 1990)).  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Id.* at (¶14) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  Moreover, our review is limited to the record established before the hospital.  *See Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989).

¶15.  This Court has recognized that when reviewing a hospital's decision to limit a doctor's

---

its occurrence.

7

privileges:

> No court should substitute its evaluation of such matters for that of the hospital board. It is the board, not the court, which is charged with the responsibility of providing a competent staff of doctors. The board has chosen to rely on the advice of its medical staff, and the court cannot surrogate for the Staff in executing this responsibility. Human lives are at stake, and the governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff. The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance. The court is charged with the narrow responsibility of assuring that the qualifications imposed by the board are reasonably related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere.

*Som*, 98 So. 3d at 502-03 (¶8) (citations omitted).

**DISCUSSION**

¶16.    According to Dr. Molleston, River Oaks violated its own bylaws and his due-process rights when Dr. Bush actively particpated in the Credentials Committee's decision to deny his application, and then served as a deliberating and voting member of the Fair Hearing Plan Committee. Dr. Molleston also argues that River Oaks's reason for denying his application fails to comply with section 73-25-93(1). Finally, Dr. Molleston alleges that River Oaks's decision should be reversed because the chairman of the Fair Hearing Plan Committee, Dr. Shelton, was a direct economic competitor.[4] We will address only the dispositive issue of

---

[4] According to Dr. Molleston, subsequent to the hearing, he learned that Dr. Shelton, the chairperson of the Fair Hearing Plan Committee, worked with a medical group who recently hired a fellowship-trained spinal surgeon who performed surgeries similar to that of Dr. Molleston. As a result, Dr. Molleston claims that Dr. Shelton's group practice placed him in direct economic competition with Dr. Molleston, and thus disqualified him as a board member. Dr. Molleston provides that Dr. Shelton failed to disclose this information at the hearing, therefore Dr. Molleston was unaware of this alleged conflict. Hence, Dr. Molleston

8

whether River Oaks failed to comply with its own Bylaw requirements due to Dr. Bush's participation in both the adverse credentialing recommendation and in the subsequent decision of the Fair Hearing Plan Committee.

¶17. The review hearing procedures established by the Bylaws for the review of adverse credentialing recommendations disqualified Dr. Bush from participating in the deliberation and decision of the Fair Hearing Plan Committee since he participated in the initial adverse credentialing recommendation.[5] Dr. Bush's participation in the deliberation and decision of the Fair Hearing Plan Committee violated the procedures established by River Oaks in its own Bylaws to provide for a fair review of an adverse recommendation of an application for medical-staff privileges. Mississippi Code Annotated sections 41-9-1 (Supp. 2014) and 73-25-93 authorize hospitals to deny hospital privileges to any physician considered to be unqualified, so long as the hospital follows its own bylaws.

¶18. Article 15.1.3 of the Bylaws states that "all hearings and appellate reviews shall be in accordance with the procedural safeguards set forth in this Article to assure that the affected individual is accorded all rights to which [he] is entitled." As stated, our judicial review is limited in this case to determine whether River Oaks followed its own procedural due-process requirements, and we recognize that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."

---

raised no objection to Dr. Shelton's presence. We acknowledge that the record shows that the Bylaws state that "members" possess a right to a Fair Hearing Plan Committee free of economic competitors. We decline to address the issue of any alleged economic conflict as applied to an "applicant" for medical staff privileges.

[5] *See* Article 15.4.1 of the Bylaws.

*Warnick*, 904 So. 2d at 1022 (¶11). River Oaks defined for itself within its Bylaws what constituted a meaningful time and meaningful opportunity to be heard.

¶19. The Mississippi Department of Health performs the licensing of hospitals in Mississippi, in accordance with Mississippi Code Annotated section 41-9-11 (Rev. 2013). *See Claypool v. Mladineo*, 724 So. 2d 373, 379 (¶18) (Miss. 1998) (discussing the licensing of state hospitals and the rules and regulations, or minimum standards, governing the licensing and standards for the operation of hospitals in Mississippi). To maintain its license, a hospital must comply with the Department of Health's rules and regulations governing hospital operations. Hospital bylaws ensure that the procedures of the hospital's governing boards comply with the professional standards required for licencing. The Department of Health "promulgates rules and regulations governing the licensing and standards for the operation of hospitals in the state" in accordance with Mississippi Code Annotated section 41-9-17 (Rev. 2013). *Id*. In *Claypool,* the Mississippi Supreme Court explained:

> These regulations, known as the Minimum Standards of Operation for Mississippi Hospitals (M.S.O.M.H.), require each hospital to establish a medical staff which has the overall responsibility for the quality of medical care provided to patients in the hospital. Hospital governing boards are required to delegate to their medical staffs the responsibility for evaluation of the professional competence of their fellow medical staff members.

*Id*. (internal citations omitted). Additionally, these "minimum standards do not require the medical staff to be employees of the hospital." *Id*. at (¶19).[6]

---

[6] As acknowledged by the supreme court in *Claypool*, medical-staff bylaws establish committees and procedures to accomplish the evaluation of professional competence, as required by the hospital minimum standards in order for hospitals to maintain licensing. *Claypool*, 724 So. 2d at 379 (¶18). The supreme court has explained that the "evaluation of the competence and qualification of medical staff members is most often performed in the

¶20. Mississippi Administrative Code 15-16-1:41.5 provides that a hospital's governing body possesses "overall responsibility for the conduct of the hospital in a manner consistent . . . [with] high quality of patient care." The Code further provides that among the duties of the hospital's governing body is the duty to adopt bylaws. *Id*. A hospital's bylaws must "provide the method of appointment, re-appointment, and removal of members of the medical staff." *Id*. Bylaws must also establish committees to conduct the review of applicants for medical staff membership. *See* Miss. Admin. Code 15-16-1:41.6. The Code also specifically allows the governing body to "delegate to the medical staff the authority to evaluate the professional competence of applicants for staff membership and/or clinical privileges[,]" and requires that the governing body "hold the medical staff responsible for making recommendations to the governing body concerning initial staff appointments" and grant of clinical privileges. *Id*.

¶21. River Oaks adopted the Bylaws and delegated to its medical staff the authority to evaluate the professional competence of applicants for medical-staff privileges. Section 73-25-93 required River Oaks and its medical staff to abide by the procedures set forth in the Bylaws regarding due process. *See Warnick*, 904 So. 2d at 1022 (¶12). In this case, the Credentials Committee met twice, and Dr. Bush served as chair of the Credentials

_____

appointment and reappointment procedures specified in the medical staff bylaws," and the supreme court acknowledged that these procedures are required by the M.S.O.M.H. *Claypool*, 724 So. 2d at 379 (¶20). "The medical staff bylaws establish committees for the review of qualifications and competence of applicants for medical staff membership and current medical staff members." *Id*. Upon application for appointment to the medical staff of a hospital, a credentials committee first reviews the applicant's qualifications. *Id*. Next, "[t]he credentials committee makes a recommendation to the medical staff executive committee[,] which in turn makes a recommendation to the hospital board." *Id*.

11

Committee. The relevant article of the Bylaws provides that when the Credentials Committee recommends denying an applicant's request for hospital medical-staff membership, the applicant may request a hearing before the Fair Hearing Plan Committee. The Bylaws also provide the following:

> 15.4    Composition of Hearing Committee:
>
> 15.4.1        If a hearing is requested in a timely manner, the hearing shall be held before a committee of five (5) Active Medical Staff members who are appointed by the Medical Executive Committee, and are not in direct economic competition with the staff member involved. . . . *No Staff member or Board member who has actively participated in the consideration of the adverse recommendation or decision shall be appointed a member of this hearing committee.*

(Emphasis added).

¶22.    Relevant to the disposition of this appeal, a violation of Article 15.4.1 occurred when Dr. Bush participated in the deliberation and decision of the Fair Hearing Plan Committee after he served as chair of the Credentials Committee.[7] As discussed, the Credentials

---

[7] While we find section 73-25-93(1) controlling, we acknowledge that Dr. Molleston cites to *Banana v. State*, 638 So.2d 1329, 1330-31 (Miss. 1994), and argues that the concept that the same person cannot serve in both a prosecutorial and judicial position on the same matter is well-established in a criminal setting. In *Banana*, both circuit judges in the district were disqualified from presiding over the post-conviction relief motion because one judge had been the district attorney at the time of prosecution, while the other was the assistant district attorney at the same time. *Id*. at 1331. Dr. Molleston asserts that this same concept carries over to an administrative proceeding. *See Freeman v. Pub. Emp. Ret. Sys.*, 822 So. 2d 274, 281 (¶21) (Miss. 2002) ("Administrative proceedings should be conducted in a fair and impartial manner, free from any suspicion of prejudice or unfairness. . . . Due process guarantees neutrality on the part of those sitting in a judicial or semi-judicial capacity.").

In *Dean v. Public Employees' Retirement System*, 797 So. 2d 830, 833 (¶18) (Miss. 2000), two members of the Medical Board who reviewed an application for benefits also later sat on the Disability Appeals Committee. The supreme court held that the Board of Trustees was not authorized "to appoint a committee comprised partly of members of the Medical Board to sit as hearing officers in review of a decision by the Medical Board." *Id*.

Committee recommended denying Dr. Molleston's application.

¶23. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner[,]'" and we must look to the hospital's own bylaws to determine if the proceedings adhered to the bylaws' requirements for meaningful manner and meaningful time. *Warnick,* 904 So. 2d at 1022 (¶14). In this case, the composition of the Fair Hearing Plan Committee members participating in the decision to deny Dr. Molleston's application violated Article 15.4.1. Additionally, this violation of a mandatory Bylaw provision during the proceedings was not remedied prior to the final decision by River Oaks, and therefore constitutes error because the manner of the proceedings failed to comport with the Bylaws. In *Warnick*, the supreme court found that the claimed bylaw violation and lack of notice were remedied when a hospital held a subsequent hearing giving Warnick two opportunities to attend, present evidence, and testify. *Id*. at 1023 (¶17). The *Warnick* court found the case of *Noxubee County Board of Education v. Overton*, 483 So. 2d 301, 302-03 (Miss. 1985), similar in that the "mandatory dictates" were not followed, but the error was later remedied by a subsequent hearing. *Id*. at (¶18). *See Wong*, 565 So. 2d at 551. We thus find in this case that the failure to remedy the violation of the Bylaws' mandatory dictate as to the composition of the Fair Hearing Plan Committee results in reversible error.

¶24. Based upon the foregoing, we reverse the chancery court's judgment, and we remand

---

at 836 (¶¶25-26). The supreme court explained that it would not address the possible due process violation since statutory law failed to authorize Medical Board members to serve on the Appeals Committee. *Id*. at 836-37 (¶27).

13

this case to the Board of Trustees to review Dr. Molleston's application in accordance with procedures established in the Bylaws. Dr. Molleston's remaining issues are moot; we decline to comment upon the weight or sufficiency of the evidence submitted below, since we must reverse on procedural due-process grounds for the failure to comply with applicable hospital bylaw procedures.

¶25. **THE JUDGMENT OF THE RANKIN COUNTY CHANCERY COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., IRVING, P.J., BARNES, ISHEE, MAXWELL AND JAMES, JJ., CONCUR. GRIFFIS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY WILSON, J. FAIR, J., NOT PARTICIPATING.**

**GRIFFIS, P.J., DISSENTING:**

¶26. I respectfully dissent.

¶27. I begin with my concern as to whether Dr. Molleston preserved his objection to a due-process violation. Dr. Molleston was aware that Dr. Bush was present at the hearing. Yet Dr. Molleston made no objection. Instead, the objection was raised only after he received an adverse ruling.

¶28. According to the transcript of the May 2 hearing, the chair identified the committee members and included Dr. Bush. Dr. Molleston was aware that Dr. Bush had been on the Credentials Committee and made no objection.

¶29. Due process certainly provides Dr. Molleston the right to be heard. It does not, however, allow Dr. Molleston to remain silent until after the hearing. I am of the opinion that Dr. Molleston waived his due-process objection because he did not timely raise it. *See*

14

*Terrell v. Tschirn*, 656 So. 2d 1150, 1152 (Miss. 1995) ("Terrell should not be allowed to take his chances with a jury and then, after he loses, file his motion."); *Buchanan v. Buchanan*, 587 So. 2d 892, 897 (Miss. 1991) (a court "will not allow a party to take his chances with a judge about whom he knows of grounds for recusal and then, after he loses, file his motion"); *Wilbanks v. Gray*, 795 So. 2d 541, 547 (¶25) (Miss. Ct. App. 2001) ("If the appellants had a problem with the religious affiliation of the special chancellor, their motion for recusal should have been filed at the beginning of the action rather than after receipt of an adverse ruling."). For these reasons, I would find Dr. Molleston waived his due-process objection.

¶30. Further, I am of the opinion that Dr. Molleston has not shown a violation of the bylaws. The composition of the Hearing Committee was established in article 15.4.1. Dr. Molleston argues that Dr. Bush's participation violated the last sentence, which reads: "No Staff member or Board member who has actively participated in the consideration of the adverse recommendation or decision shall be appointed a member of this Hearing Committee."

¶31. The bylaws also provide that the right to a hearing is for the review of "a recommendation of the Medical Executive Committee that . . . will adversely affect his/her appointment . . . ." Article 15.1.1. Article 15.2.1 provides for "notice of an adverse recommendation by the Medical Executive Committee." Then, article 15.5.11 provides that the Hearing Committee's recommendation pertains to "the original adverse recommendation of the Medical Executive Committee." Therefore, the reference in article 15.4.1 to "the

consideration of the adverse recommendation or decision," is to the "recommendation of the Medical Executive Committee," not to any preliminary recommendation by the Credentials Committee.

¶32. Dr. Bush served on the Credentials Committee, not the Medical Executive Committee. The bylaws do not prohibit a physician in that capacity from serving on the Hearing Committee. According to the record, Dr. Bush did not "actively participate" in the Medical Executive Committee's decision. The Medical Executive Committee's minutes state:

> DR. BUSH: I was not [at the Medical Executive Committee meeting]. I'm part of the Credentials Committee—
>
> DR. MORIARITY: Oh, okay. I'm not part of credentials, so I don't—I have not—I can't speak about that meeting.
>
> DR. BUSH: But I was not at either of the meetings of the Med[ical] Exec[utive Committee].

¶33. Also, article 15.4.1 prohibits a person who participated in the Medical Executive Committee decision from being "appointed a member of this Hearing Committee." There is no indication in the record that Dr. Bush was appointed a member of the Hearing Committee. Dr. Molleston does not make this argument; instead, Dr. Molleston states that Dr. Bush "deliberated with the Fair Hearing Committee" and "apparently" voted "as a member of the Fair Hearing Committee." There appears to be no appointment of Dr. Bush as a member of the Committee, which would violate the bylaws.

¶34. The chancellor held:

> The decision makers were those doctors specifically named to the Committee. Dr. Bush, with other persons not on the Committee, did participate at the hearing and the discussion after the hearing and all who attended the

16

discussion signed the minutes or opinion. All committee members present ruled unanimously against the Appellant. While it may have been better if only the actual committee members signed the minutes or opinion, the signature of Dr. Bush and the other non-committee members constitutes harmless error.

¶35. I find no error in the chancellor's decision. Therefore, I respectfully dissent. I would affirm the chancellor's judgment.

**WILSON, J., JOINS THIS OPINION IN PART.**